## HOUSTON E. & W. T. RY. CO. et al. v. SOUTHERN PINE LUMBER CO. (No. 1607.)

Court of Civil Appeals of Texas. Beaumont. April 12, 1928.

**1. Courts ⊖170—Plaintiff, who inadvertently fixed damages in petition for death of cattle at sum exceeding value, was properly permitted to reduce demand to jurisdictional amount.**

In suit against carrier to recover for death of cattle in transit, plaintiff, who inadvertently fixed damages for death of 24 cattle at over $1,000, a sum in excess of court's jurisdiction, was properly permitted to amend petition by reducing demand to jurisdictional amount, where evidence was uncontradicted that actual value of the cattle was well within court's jurisdiction.

**2. Carriers ⊖219(5)—Initial carriers, sued for death of cattle in transit, were liable for negligence of connecting carriers.**

Initial carriers, sued by shipper for death of cattle in transit, were liable if death resulted through negligence anywhere on route, regardless of whether negligence occurred on defendant's lines or was that of connecting carriers.

**3. Carriers ⊖228(1)—One shipping cattle in charge of caretakers had burden of proving negligence in action against carriers for cattle's death.**

In shipper's suit against carriers for negligence in handling cattle, causing death of some of cattle, burden of showing negligence was on shipper, where shipment was in charge of caretakers.

**4. Carriers ⊖228(3)—Admission of evidence that caretakers requested railroad to unload dead cattle, where person requested was not identified, held error, in shipper's action for damages.**

In action by shipper against carriers for negligence resulting in death of some of cattle shipped, admission of evidence of caretakers that they requested "the railroad to unload the dead cattle," explaining that the dead cattle were a menace to the other cattle, held error, since witnesses should have identified person

to whom request was made as having authority.

5. **Carriers** ⬯215(1)—**Failure of carrier to comply with caretakers' request that dead cattle be unloaded from car held not negligence warranting recovery for death of other cattle, unless request was made to person in authority.**

Failure of carrier to remove dead cattle on request of caretakers accompanying shipment, who explained that presence of dead cattle was a menace to the others, *held* not to render carriers liable for negligence, in shipper's action for death of some of the other cattle, unless request for their removal was made to some responsible authority.

6. **Carriers** ⬯230(4)—**Negligence and proximate cause held questions for jury, in shipper's action against carriers for death of cattle due to negligent failure to unload cattle already dead.**

Issue of carrier's negligence and of proximate cause *held* for jury, in action by shipper for death of cattle alleged to have been due to carriers' negligent failure to unload cattle already dead from cars, at request of caretakers accompanying shipment.

7. **Carriers** ⬯230(1)—**Amount of damages held question for jury, in shipper's action against carriers for death of cattle in transit.**

Issue of amount of damages *held* for jury, in action by shipper against carrier for death of cattle in transit, where testimony offered on issue was that of expert testifying in plaintiff's behalf.

8. **Evidence** ⬯570—**Trial** ⬯140(2)—**Weight of expert testimony and credibility of interested witnesses are questions for jury.**

Weight of expert testimony is question for jury, and witness' credibility is also for jury, where he is interested.

9. **Appeal and error** ⬯1177(7)—**Absence of evidence as to value of cattle at destination required reversal of judgment for shipper for death of cattle in transit.**

Absence of evidence as to value of cattle at point of destination *held* to require reversal of judgment in shipper's favor, in action against carriers for death of cattle in transit, due to carriers' negligence.

Appeal from Angelina County Court; R. A. Courtney, Judge.

Action by the Southern Pine Lumber Company against the Houston East & West Texas Railway Company, the Texas & Southeastern Railway Company, and others. From an adverse judgment, defendants named appeal. Reversed and remanded.

Garrison & Watson, of Houston, for appellants.

Fairchild & Redditt and Tom F. Coleman, all of Lufkin, for appellee.

WALKER, J. On the trial of this case to a jury in the county court of Angelina county, the verdict was peremptorily instructed in appellee's favor against appellants for the sum of $607.40. By its pleading, appellee claimed damages to a shipment of cattle originating on the line of appellant Texas & Southeastern Railway Company and by it delivered to appellant Houston East & West Texas Railway Company, for transportation to Aguilares, Tex. As originally instituted, all connecting carriers from point of origin to destination were made defendants, but before trial all defendants were dismissed except the two appellants, Texas & Southeastern Railway Company and Houston East & West Texas Railway Company. The negligence charged was (a) "in handling and caring for said cattle"; (b) "in delaying the transportation of them"; (c) "in failing on request of appellee's agents and caretakers in charge of the shipment to remove dead cattle from the car at Yoakum, thereby causing more of the cattle to be thrown down and trampled to death and injuring others. By its original petition, appellee sued for the death of 20 head, of the alleged value of $940. By an amended petition, the number of dead was increased to 24, and the damages fixed at $1,065. After the filing of the amended pleading, appellants excepted to the jurisdiction of the county court. Thereupon appellee filed another amended petition, reducing its claim by reducing the alleged value of the cattle to an amount within the jurisdiction of the county court. The proof showed that the shipment from origin to destination was in charge of appellee's caretakers, E. C. Midkiff and J. J. Ray. On the issue of value, Mr. Ray, a witness for appellee, testified as follows:

"Yes; several cattle were badly tramped up, and out of that number we lost five head in driving to the ranch. At that time I was familiar with the reasonable market value of blooded cattle such as were loaded on the T. S. E. Railroad Company cars. Those cattle that were lost were one steer, 2 years old, 9 cows 4 or 5 years old, and 10 heifers about 2 years old; and those that died going out were 2 years old. I suppose those cattle, if put on the market here at home, would have brought from $20 to $25.

"Q. What would they have brought at any other market? A. Those cows would have sold at that time for about $30.

"Q. What was the value of the 2-year olds? A. They would have sold for about the same as the cows, $30. The heifers would have sold for about $20. As I remember about the ones that were lost after unloading, the 5 head, were 4 heifers and one steer. The steer was a 2-year old; he would run about like the heifers, about $20. The 4 heifers would have been worth about $20 each. The one 2 year old steer that we lost before we got there was worth about as much as the cows. He might have been worth $25; I think he would have brought that. I had to put 5 head in pens after I reached the destination before they were able to go on the range, and one of those died,

and the other 4 were saved. It would be hard to figure the amount of depreciation in value which was caused the other cattle in those four cars on account of bruises, etc., caused by the failure of the defendant to remove the dead cattle when I requested them to do so. Of those four cars there were a good many cattle that took a long time to get over it. To average what it would be worth in those four cars would be hard. I don't think we lost any more, except the five head. I don't remember just what the freight per head would be; something over $2 though, as well as I remember, but I don't know exactly how much it was. In transit we lost 20 head, and the railroad company nevertheless collected freight from us at the point of destination for the entire herd of 660 head; but they delivered alive only 640 head. Then I lost 3 head before I got to the ranch, and 2 died out there. * * * When we delivered the cattle to the T. S. E. Railroad Company there was an agreement with the company that they should deliver the cattle in good condition. I don't think, if they had followed my advice, there would have been many more dead than were dead at Yoakum. That was my motive for getting them to clean up the cars, thinking that we would stop the loss at Yoakum."

On the issue of negligence, this same witness testified:

"I think there were 5 or 6 dead at Yoakum; I don't know the exact number. There were so many cattle down in those cars that it was hard for the others to stand up, and they stumbled over the ones that were down; and, in my experience as a cattleman and a shipper of cattle, occasionally a cow will get tired, especially after they have been in the car 24 hours, and lie down to rest, generally on the side of the car. If they lie down in the middle of the car, they damage the whole car. Occasionally when a cow lies down to rest, she may not be hurt, but the other cows stumble over her and trample her to death. I can't say whether that is how these cows that were dead at Yoakum came to be dead. I can't say how they got down, but they were down and dead. And from there on to Alice, Tex., my opinion is that other cattle stumbled over them and trampled them and then got down and were not able to get up, having fallen from stumbling over the other cattle. I think there were something like 18 cattle taken out dead at Aguilares. There were 5 of those cattle that were taken out alive that were badly trampled and were not able to start, and I put them in a little lot hoping they would be able to go. One of them died, and I saved 4. All the cattle arrived in good shape except those that got down in the car and had been trampled on; 18 were taken out of the car dead, and one died in the pen, and we lost 5 others; 3 died going out, 3 of those that had been trampled; and 2 died after we got them out to the tank—that made 5 in all. The others were all right. There were other cattle that were damaged by being tramped that lived, and went on, that were in bad condition, but they overcame it, and caused us no actual loss. I rode all the way with the shipment. The cattle were turned over to the H. E. & W. T. at Diboll in good shape, and arrived at Houston on the H. E. & W. T. in good shape. The H. E.

& W. T. turned them over to some one else in good shape, at Houston; and the H. E. & W. T. had nothing more to do with them after they left Houston. There were no wrecks, and nothing unusual happened to the trains. I rode with the conductor, and have met some of the conductors here.

"I think, if the cattle had been straightened up, they should have rode on down in good shape. As well as I remember, 5 or 6 of the cattle had died before we reached Yoakum, and a good many cattle were down, and they were piled up so that we couldn't do anything with them. We got in and tried to straighten them up, but it couldn't be done.

"My complaint with the railroad people is their action in refusing to remove these cattle from the cars at Yoakum. They failed to unload the cattle and straighten them up.

"I have seen the conductors of all the roads here. I rode with them, and had no complaint with them. They treated me all right. The train movements were all right. These cattle went all the way in the same cars in which they were originally loaded. Let me state that the Texas & Mexican people had a little trouble on the road. They had some trouble with the engine, and were delayed a little, but that was all. It was a minor matter, and it is my opinion that that didn't affect the cattle. As I remember it, we left here on the night of the 27th and got to Aguilares some time in the morning of the 29th. So the cattle were in the car from the evening of December 27th until some time in the morning of December 29th. It was early in the morning of the 29th. That would be something like 36 hours for the whole run, and the cattle were standing in the cars for that length of time.

"Q. It is a fact that cattle standing that long in a car will naturally attempt to lie down because they become tired? A. No cattleman would sign a contract that he thought would be injurious to his cattle.

"Q. But they will get tired in that time? A. It will depend entirely upon the condition of the cattle; just like I can stand more than a child, or a strong steer more than a cow, or a cow more than a weak heifer. And of the 660 head they would not all be in absolutely the same condition; there would be a difference in the class of the cattle, and in their ages and sizes."

The other caretaker, Mr. Midkiff, testified:

"The complaint I have with the railroad company, whatever railroad it was, at Yoakum, didn't allow us to unload the cattle; that and the claim of the dead cattle. That is what caused the dead cattle; they just kept getting down over those dead cattle until they couldn't get up."

## Opinion.

[1] The court did not err in refusing to dismiss appellee's cause of action on the ground that the jurisdiction of the court had been exceeded by the filing of the amended petition increasing the amount in controversy to a sum in excess of $1,000. A plaintiff cannot "confer jurisdiction by waiving a portion of any severable item, sued on, or by arbitrarily reducing the value of property or services which are the subject-matter of the suit."

Williams v. Trinity Gravel Co. (Tex. Civ. App.) 297 S. W. 878. But where the amount claimed is unliquidated, and the pleader by inadvertence or mistake fixes his damages at a sum in excess of the jurisdiction of the court, he may by amendment filed in good faith retain his jurisdiction by reducing his demand to a jurisdictional amount. No contention is made here that the value of the cattle in fact exceeded the jurisdiction of the county court, but, on the contrary, the evidence is uncontradicted that their value was well within the court's jurisdiction. Therefore the reduction in the amount claimed was not fraudulently made. It is perfectly clear, also, that the jurisdictional amount was exceeded through an inadvertence or mistake on the part of the pleader. We say this because Judge Coleman, representing appellee in the filing of these petitions, is recognized by us as an able lawyer, thoroughly qualified to practice at our bar, and fully versed in the jurisdiction of the different courts of the state. In Taylor v. Buzan, 241 S. W. 1084, discussing such an "inadvertence or mistake" and the right of plaintiff to amend, the San Antonio Court of Civil Appeals said:

"It is conceded that according to the petition the value of plaintiff's services, for which he sought to recover, was in excess of the jurisdictional amount. These allegations were made through no mistake or inadvertence, such as a typographical error, or inaccurate calculation. If they had been, the error could have been corrected by an amended pleading, subject to the trial court's sound discretion. Railway v. Hamrick [(Tex. Civ. App.) 231 S. W. 166] supra; Evans v. Mills, 16 Tex. 196; McDannell v. Cherry, 64 Tex. 177; Greer v. Drug Co., 1 Tex. Civ. App. 634, 20 S. W. 1127."

In Hufstutler v. Railway Company, 216 S. W. 496, where the plaintiff's demand exceeded the jurisdiction of the court but before announcement of ready for trial was in good faith reduced to an amount within the court's jurisdiction, in this respect being in exact point on the proposition involved here, the Austin court said:

"The evidence received by the court, which seems to have been introduced without objection, shows that before announcement of ready appellant reduced his damages to the sum of $165, and this was clearly within the jurisdiction of the justice court, even if the element of 6 per cent. damages were added. Our statutes and rules confer the right upon either party to amend pleadings, and this right extends even to a jurisdictional matter. A plaintiff has the right to amend his petition so as to cure a defect of jurisdiction. McDannell & Co. v. Cherry, 64 Tex. 177; Greer v. Richardson Drug Co., 1 Tex. Civ. App. 634, 20 S. W. 1129; Miller v. Newbauer [Tex. Civ. App.] 61 S. W. 974. When such an amendment is made, the amount claimed upon the trial is the amount in controversy, and not the amount stated in the original pleading. Peeples v. Slayden-Kirksey Woolen Mills [Tex. Civ. App.] 90 S. W. 61; Burke v. Adoue, 3 Tex. Civ. App. 494, 22 S.

W. 825, 23 S. W. 91; Watson v. Mirike, 25 Tex. Civ. App. 527, 61 S. W. 540."

Without quoting or analyzing appellee's original and amended petitions, it is our conclusion that all of them were based on the same cause of action; that is, for damages to a shipment of cattle originating on the line of the Texas & Southeastern Railroad Company, and accruing under the statute. On the theory that the original petition was a common-law action, and that the amended petitions were under the statute, and that the amended petitions were filed more than two years after the accrual of the cause of action, appellants assert the proposition that the amended petitions state a new cause of action barred by limitation. This proposition is overruled.

[2] Appellants were not entitled to an instructed verdict on the ground that the negligence did not occur on their lines. Under the statute, as initial carriers, they were liable. We do not clearly understand appellants' position on this proposition. After saying that they were not liable, in their argument they advance the following proposition, which we think is sound, and which holds them in the case:

"Appellee dismissed two of the carriers which handled this shipment with the thought that it could hold the Texas & Southeastern Railway Company and the Houston East & West Texas Railway Company liable under the statute which provides that a shipper may sue any one of the carriers which handled the shipment en route, and that the initial carrier and each connecting carrier are all the agents of each other. It is true that under said statute appellee could have sued the Houston East & West Texas Railway Company, this appellant, and could have held this appellant liable for damages accruing anywhere en route, even though the damages happened while the shipment was in the hands of its connecting carrier."

The case must be reversed on the following propositions:

[3-5] (a) In this case appellee was under the burden of showing negligence in the handling of the cattle, since its shipment was in charge of its two caretakers. Therefore it was error to permit these caretakers to testify, over timely objection, that at Yoakum they requested "the railroad to unload the dead cattle," explaining in connection with this testimony that the dead cattle, five or six in number, were a menace to the other cattle. These witnesses should have identified in some way the person to whom this request was made. Appellants could be held liable only on the theory that the request was made to some responsible authority.

[6] (b) The court erred in instructing peremptorily against appellants, since neither the issue of negligence nor of proximate cause followed as a matter of law on the statement

we have made supra. Both of these issues should be submitted on another trial.

[7, 8] (c) The court also erred in peremptorily instructing as to the amount of the damages. The testimony offered on this issue was only that of an expert testifying for his master. The weight of expert testimony is for the jury, and, where the witness is interested, his credibility also is for the jury.

[9] (d) No evidence was offered as to the value of the cattle at the point of destination. This should be done on another trial.

Reversed and remanded.